Case 1:24-cv-06045-ER    Document 1-1    Filed 08/08/24    Page 1 of 27

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JAMES DOYLE,

Plaintiff,

v.

AMERICAN IRISH HISTORICAL SOCIETY
INC., and "JOHN DOE ONE" through "JOHN DOE
FOUR," said names being fictitious, the parties
intended being possible tenants or occupants of the
premises, and corporations or other entities or
persons who claim, or may claim, a lien against the
premises,

Defendants.

-----------------------------------------------------------------

PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL OF THE
STATE OF NEW YORK,

Plaintiff-in-Intervention,

v.

JAMES DOYLE,

Defendant-in Intervention.

---

Index No. 850468/2023

**VERIFIED COMPLAINT-IN-INTERVENTION**

The People of the State of New York, by their attorney, Letitia James, Attorney General of the State of New York (the "Attorney General"), respectfully allege as follows:

### PRELIMINARY STATEMENT

1.      On behalf of the People of the State of New York, the Attorney General brings this action to prevent James Doyle ("Doyle"), the Defendant-in-Intervention, from foreclosing on the primary asset of the American Irish Historical Society (the "Historical Society"), a charitable

1

Case 1:24-cv-06045-ER    Document 1-1    Filed 08/08/24    Page 2 of 27

organization incorporated in the State of New York. The asset at issue is the five-story building in New York City that, for more than 80 years, has served as the Historical Society's headquarters (the "Fifth Avenue Townhouse"). Doyle is a former member of the Historical Society's board of directors, and, although not discussed in his complaint, his foreclosure action is in fact based on an illegal—and thus unenforceable—related party transaction that he engaged in with the Historical Society.

2.     The Attorney General is authorized to oversee the activities of not-for-profit corporations, including charitable organizations, and the activities of their directors, officers, key persons, and agents. The Attorney General represents "the beneficiaries of . . . dispositions for . . . charitable . . . or benevolent purposes" and has a "duty to enforce the rights of such beneficiaries by appropriate proceedings in the courts." N.Y. Est., Powers & Trusts Law § 8-1.1(f). To that end, the Attorney General may, among other things, "bring an action to . . . void or rescind any related party transaction or proposed related party transaction," involving a charitable organization, "that violates" the Not-for-Profit Corporation Law. N.Y. Not-for-Profit Corp. Law § 715(f); *see also* N.Y. Not-for-Profit Corp. Law § 112(a)(10) ("The attorney-general may maintain an action . . . [t]o . . . void or rescind any related party transaction.").

3.     The Historical Society is a New York-based charitable organization whose purpose is to encourage and promote historical research relating to Americans of Irish descent. The Historical Society was founded in 1897; incorporated in 1940 in the State of New York; and continues to operate in the State of New York, including in New York City. The activities of the Historical Society, together with those of its directors, officers, key persons, and agents, are subject to the Attorney General's oversight authority.

4.     At all relevant times, including at the time of the illegal related party transaction at

issue, Dr. Kevin Cahill ("Dr. Cahill"), the Historical Society's now-deceased president-general emeritus, controlled and dominated the organization. Dr. Cahill selected board members—including Doyle—who supported his continued domination and control of the Historical Society. Dr. Cahill also arranged for his son, Christopher Cahill, to be installed as the organization's executive director, and for other family members, including his son Kevin Cahill Jr. and nephew Cornelius McGinity, to serve on the board of directors.

5.      Dr. Cahill's domination and control of the Historical Society was to the organization's significant detriment. His son Christopher Cahill was unable or unwilling to perform his duties as executive director, conducting himself in a way that interfered with the Historical Society's operations and its development and fundraising efforts. Despite Christopher Cahill's conduct, Dr. Cahill opposed efforts to remove Christopher Cahill from his position. Dr. Cahill even arranged at times for the removal of directors who sought to hold Christopher Cahill accountable for his conduct, or who sought to replace Christopher Cahill with a new executive director capable and willing to perform the duties of the position.

6.      By 2017, in major part because of the issues associated with Dr. Cahill's domination and control of the organization, including the leadership failures of Christopher Cahill, the Historical Society was in significant financial distress.

7.      That same year, at the urging of Dr. Cahill, Doyle—a Georgia-based businessman—joined the Historical Society's board of directors. In March 2017, shortly after he joined, the Historical Society engaged in a transaction with Doyle in which the organization obtained a $3 million loan from Doyle at an initial interest rate the higher of five percent or the prime rate less two-and-a-half percent. In consideration for the loan, Doyle obtained a mortgage on the Historical Society's primary asset: the Fifth Avenue Townhouse.

3

Case 1:24-cv-06045-ER     Document 1-1     Filed 08/08/24     Page 4 of 27

8.      In connection with the transaction, Doyle also pledged, on a "good faith" basis, to make an annual contribution to the Historical Society in the amount that the organization's interest payments exceeded his cost of funds.

9.      Under New York law governing related party transactions involving charitable organizations, Doyle, as a member of the Historical Society's board of directors, was required to disclose to the board of directors or an authorized committee thereof his interest in transaction. *See* Not-for-Profit Corp. Law § 715(a). The board or an authorized committee was likewise required to engage in a formal review and approval process, including making a determination that the transaction was "fair, reasonable and in the corporation's best interest." *See id.* § 715(a)-(b). But none of that took place here. On the contrary, the potential loan from Doyle was, upon information and belief with Dr. Cahill's approval, presented to the board of directors as being from an anonymous lender. It was also approved on that basis.

10.     The Historical Society also failed to properly disclose the transaction to federal and state authorities. The Internal Revenue Service's Form 990 ("IRS Form 990") is the central oversight and public disclosure mechanism for the not-for-profit sector under both federal and state law. The IRS Form 990 requires tax-exempt organizations to report on Line 22 of Part X whether they have loans and other payables to current officers, directors, trustees, and disqualified persons, and, if so, to file an accompanying "Schedule L" describing, as relevant here, any "[l]oans to and/or [f]rom [i]nterested [p]ersons" and "[b]usiness [t]ransactions [i]nvolving [i]nterested [p]ersons."

11.     In the Historical Society's IRS Form 990 for the fiscal year 2017, which it filed with the Internal Revenue Service in 2018, the Historical Society failed to disclose that it had a loan payable to Doyle, one of its board members, or to provide any more information about this

transaction. Instead, it reported only "secured mortgages and notes payable to unrelated third persons" of $3 million.

12.     The Historical Society represented in its IRS Form 990 for the fiscal year 2017, that, prior to filing it with the federal government, it had provided a complete copy of the document to "all members of the governing body." At that time, Doyle was a member of the board of directors, the organization's governing body. As a result, Doyle was, or should have been aware, that the Historical Society's IRS Form 990 failed to properly disclose the transaction between him and the organization.

13.     The Historical Society also failed to properly disclose the transaction to the Attorney General. All charitable organizations operating in New York must file with the Office of the Attorney General an annual financial report, called the CHAR500, attaching to it their federal tax forms for the fiscal year, including the IRS Form 990. The filing deadline for the fiscal year 2017 was November 15, 2018. But the organization failed to file timely with the Attorney General both the CHAR500 and accompanying IRS Form 990, among other necessary disclosures.

14.     On October 16, 2019, the Attorney General notified the Historical Society in a letter that the organization was significantly "delinquent in filing its annual financial report(s) with the New York Attorney General's Charities Bureau" for the fiscal year 2017. The Attorney General stated that, to resolve the delinquency, the Historical Society would need to file, by November 15, 2019, all its required filings for the fiscal year 2017, including its "IRS990" with "all schedules."

15.     The Historical Society finally filed its CHAR500 and attachments for the fiscal year 2017 with the Attorney General on November 12, 2019. Although the Historical Society certified that the report and its attachments were "true, correct and complete," the organization once again failed to properly disclose its related party transaction with Doyle.

5

16.     Just weeks later—having now failed to properly disclose the related party transaction with Doyle to both federal and state authorities—the Historical Society suddenly tried to ratify the transaction, organizing a "special meeting" in which the board of directors reviewed the history of the transaction, and then voted to ratify.

17.     Following the attempted ratification, the Historical Society's financial situation continued to deteriorate. Among other things, Doyle had declined to make annual contributions to the Historical Society in the amount that the organization's interest payments exceeded his cost of funds, as was contemplated in his donation agreement with the organization. Instead, at the behest of Dr. Cahill, Doyle had elected to contribute $400,000 in interest payments to a different organization, where Dr. Cahill was serving as president and where his son Brendan Cahill received a salary.

18.     In December 2020, the Historical Society, upon information and belief at the direction and control of Dr. Cahill, elected to sell the Fifth Avenue Townhouse and move its headquarters outside of New York City. As a member of the board of directors—and despite understanding that the Historical Society intended to use the proceeds from the sale to satisfy the $3 million loan from him—Doyle participated in deliberations about the sale of the building, and even voted in favor of the sale.

19.     The Historical Society's decision to sell the Fifth Avenue Townhouse and move its headquarters out of New York City ignited a firestorm of controversy. In early 2021, more than 40,000 people petitioned the Attorney General opposing the sale of the Historical Society's home, which they described as "a vital place for past, present and future generations."

20.     In the wake of the petition, the Attorney General commenced an investigation into the Historical Society and its financial issues. The investigation revealed significant governance

INDEX NO. 850468/2023
RECEIVED NYSCEF: 07/11/2024

Case 1:24-cv-06045-ER    Document 1-1    Filed 08/08/24    Page 7 of 27

issues within the organization, including gross mismanagement on the part of the organization's executive director Christopher Cahill.

21.     In June 2021, while the Attorney General was investigating the Historical Society—and while Doyle was still actively serving on the board of directors—Doyle elected to record the mortgage on the Fifth Avenue Townhouse that he had obtained several years earlier in the course of his related party transaction.

22.     In July 2022, the Attorney General began working with the Historical Society on a plan to revitalize the organization—and to save its historic headquarters. In November 2022, as part of that plan, the organization appointed a new interim executive director and an interim board of directors to guide the organization through a transition to a new governance structure. In turn, the organization's existing board of directors—including Doyle—all resigned from their positions.

23.     Doyle has now sued the Historical Society, filing an action in the Supreme Court, New York County, seeking to foreclose on the Fifth Avenue Townhouse and force a sale to the highest bidder.

24.     This Court should prohibit him from doing so. The Not-for-Profit Corporation Law imposes strict requirements on related party transactions involving not-for-profit corporations, including charitable organizations like the Historical Society. *See* N.Y. Not-for-Profit Corp. Law § 715(a)-(b). In violation of those requirements, Doyle failed to disclose his interest in the transaction to the Historical Society's board of directors, or an authorized committee thereof. *See id.* § 715(a). Instead, he allowed himself to be presented as an anonymous benefactor without related party status. The board of directors, or an authorized committee thereof, likewise failed to engage in the formal review and approval process required under the law, including making a determination that the transaction was "fair, reasonable and in the corporation's best interest." *See*

Case 1:24-cv-06045-ER    Document 1-1    Filed 08/08/24    Page 8 of 27

*id.* § 715(a)-(b). Doyle thus violated, and caused additional violations of, the Not-for-Profit Corporation Law.

25.    Although the Historical Society's board of directors tried to ratify the related party transaction, that ratification attempt is no defense to the Attorney General's action. *See id.* § 715(j). Among other things, it took place only after the Attorney General requested information from the Historical Society about its related party transactions for the fiscal year in which the transaction took place—not to mention after the Historical Society filed required disclosures with both the federal government and the Attorney General that failed to properly disclose the transaction.

26.    Doyle also violated the Not-for-Profit Corporation Law—in addition to breaching his fiduciary duties as director—by participating in deliberations and voting related to the Fifth Avenue Townhouse, including the board of directors' vote to sell the building. *See id.* § 715(h).

27.    Because of these violations of the Not-for-Profit Corporation Law, the related party transaction in which Doyle obtained a mortgage on the Fifth Avenue Townhouse should be declared void pursuant to Not-for-Profit Corporation Law § 715(f). Doyle's foreclosure action, in turn, should be dismissed with prejudice.

## THE PARTIES

28.    The Attorney General brings this action on behalf of Plaintiff-in-Intervention, the People of the State of New York, in her capacity as the representative of the ultimate beneficiaries of charitable dispositions. *See* N.Y. Est., Powers & Trusts Law § 8-1.1(f).

29.    Defendant-in-Intervention James Doyle is a Georgia-based businessman with an office at 2650 Business Drive, Cumming, Georgia 30028. From in or about January 2017 to November 2022, Doyle was a member of the Historical Society's Executive Council, which functions as the organization's board of directors.

30.    Nonparty The American Irish Historical Society was founded in 1897; incorporated

8

in New York State as a not-for-profit corporation in 1940; and continues to operate in New York State. The organization is a charitable organization within the meaning of New York law. It maintains its headquarters in a five-story townhouse at 991 Fifth Avenue, New York, NY 10024.

JURISDICTION AND VENUE

## I.      Jurisdiction

31.     James Doyle is subject to this Court's personal jurisdiction because, from in or about January 2017 to November 2022, he was a member of the Historical Society's board of directors, meaning he was "a director, officer, key person or agent of" the organization. *See* N.Y. Not-for-Profit Corp. L § 309; N.Y. Not-for-Profit Corp. L. § 102(a)(25).

32.     To the extent that Doyle is not domiciled in New York State, Doyle is also subject to this Court's personal jurisdiction because, as a member of the Historical Society's board of directors, Doyle "transact[ed] . . . business within" the State of New York, including business related to the Fifth Avenue Townhouse. *See* N.Y. C.P.L.R. 302(a)(1).

33.     Doyle is also subject to this Court's personal jurisdiction because he brought a foreclosure action in the Supreme Court, New York County, implicitly consenting to this Court's personal jurisdiction.

## II.     Venue

34.     Venue is properly laid in New York County because the Attorney General maintains offices throughout the State of New York, including at 28 Liberty Street, 15th Floor, New York, NY 10005. *See* N.Y. C.P.L.R. 503(a).

35.     Venue is also properly laid in New York County because the above-mentioned foreclosure action, in which the Attorney General now seeks to intervene as of right or under judicial permission, was specifically commenced in New York County.

9

**APPLICABLE LAW**

## I.  The Attorney General's Authority to Regulate Charitable Organizations

36.    As set forth in the Executive Law, the Estates, Powers and Trusts Law, and the Not-for-Profit Corporation Law, the Attorney General is authorized to oversee the activities of not-for-profit corporations, including charitable organizations, and their directors, officers, key persons, and agents. *People ex rel. Schneiderman v. James*, 39 Misc. 3d 1206(A), 2013 WL 1390877, at *4 (Sup. Ct. N.Y. Cty. 2013); *see also In re McDonell*, 757 N.Y.S.2d 678, 680 (Sup. Ct. N.Y. Cty. 2002) ("The state legislature has given the Attorney General broad supervisory and oversight responsibilities over charitable assets and their fiduciaries.").

37.    Under the Estates, Powers and Trusts Law, the Attorney General represents "the beneficiaries of . . . dispositions for . . . charitable . . . or benevolent purposes." N.Y. Est., Powers & Trusts Law § 8-1.1(f). In this role, the Attorney General has a "duty to enforce the rights of such beneficiaries by appropriate proceedings in the courts." *Id.* This includes the power to "investigate transactions and relationships of trustees for the purpose of determining whether or not property held for charitable purposes has been and is being properly administered." *Id.* § 8-1.4(i). The Estates, Powers and Trusts Law also authorizes the Attorney General to "institute appropriate proceedings to secure compliance with" the specific provisions of the law governing the supervision of trustees for charitable purposes, "and to secure the proper administration of any trust, corporation or other relationship to which" those provisions apply. *Id.* § 8-1.4(m).

## II.  The Attorney General's Authority with Respect to Related Party Transactions

38.    Under Not-for-Profit Corporation Law § 715(a), if a not-for-profit corporation's "director, officer or key person" has "an interest in a related party transaction," that person must "disclose in good faith to the board, or an authorized committee thereof, the material facts concerning such interest." The corporation, in turn, may not "enter into any related party

transaction unless the transaction is determined by the board, or an authorized committee thereof, to be fair, reasonable and in the corporation's best interest at the time of such determination." N.Y. Not-for-Profit Corp. Law § 715(a).

39.     Not-for-Profit Corporation Law § 715(b) imposes additional—and more stringent—requirements on transactions "involving a charitable corporation and in which a related party has a substantial financial interest." *Id.* § 715(b). For these types of related party transactions, the board of directors or an authorized committee thereof must follow three procedures. *Id.* First, before the corporation enters into the transaction, the board or authorized committee must "consider alternative transactions to the extent available." *Id.* Second, the board or authorized committee must "[a]pprove the transaction by not less than a majority vote of the directors or committee members present at the meeting." *Id.* And third, the board or authorized committee must "[c]ontemporaneously document in writing the basis for the board or authorized committee's approval, including its consideration of any alternative transactions." *Id.*

40.     Complimenting Not-for-Profit Corporation Law § 715(a) and (b), Not-for-Profit Corporation Law § 715(h) provides that a related party may not "participate in deliberations or voting relating to a related party transaction in which he or she has an interest." *Id.* § 715(h). The board or an authorized committee thereof may, however, "request[] that a related party present information as background or answer questions concerning a related party transaction at a board or committee meeting prior to the commencement of deliberations or voting relating thereto." *Id.*

41.     Under Not-for-Profit Corporation Law § 715(f), the Attorney General may bring "an action to . . . void or rescind any related party transaction or proposed related party transaction that violates" the Not-for-Profit Corporation Law, or that "was otherwise not reasonable or in the best interests of the corporation at the time the transaction was approved." *Id.* § 715(f); *see also*

*id.* § 112(a)(10) ("The attorney-general may maintain an action or special proceeding . . . [t]o . . . void or rescind any related party transaction . . . and other appropriate remedies, in law or equity, in addition to any actions pursuant to [Not-for-Profit Corporation Law § 715].").

42.      In actions in which the Attorney General specifically asserts that a related party transaction took place in violation of Not-for-Profit Corporation Law § 715(a) or (b), Not-for-Profit Corporation Law § 715(j) provides for an affirmative "defense." *Id.* § 715(j). To establish this defense, the party adverse to the Attorney General must show that "the transaction was fair, reasonable and in the corporation's best interest at the time the corporation approved the transaction." *Id.*

43.      Besides showing the fairness of the transaction, the party must also show that, "prior to receipt of any request for information by the attorney general regarding the transaction," the board of directors followed three procedures. *Id.* First, the board must have "ratified the transaction by finding in good faith that it was fair, reasonable and in the corporation's best interest at the time the corporation approved the transaction." *Id.* If the transaction specifically involved "a charitable corporation" and a related party with a "substantial financial interest," the board must have also "considered alternative transactions to the extent available, approving the transaction by not less than a majority vote of the directors or committee members present at the meeting." *Id.* Second, the board must have "documented in writing the nature of the violation and the basis for the board's or committee's ratification of the transaction." *Id.* And third, the board must have "put into place procedures to ensure that the corporation complies with [Not-for-Profit Corporation Law § 715 (a) and (b)] as to related party transactions in the future." *Id.*

## FACTS AND PROCEDURAL HISTORY

**I.      The Historical Society Is a New York Cultural Institution That Owns a Historic Townhouse on Fifth Avenue in New York City**

44.     Since the Historical Society's founding in 1897, the organization has served as a center of Irish culture in New York with international prominence. The Historical Society's "primary purpose" is to "encourage and promote historical research relating to Americans in the United States of Irish descent."

45.     In 1940, in or around the same time as it was incorporated in New York State, the Historical Society purchased a five-story townhouse at 991 Fifth Avenue, New York, New York 10024 to serve as its headquarters. The building, which dates to 1901, is on an iconic stretch of Fifth Avenue known as the "Museum Mile," directly across the street from the Metropolitan Museum of Art.

46.     Besides serving as the Historical Society's headquarters, the Fifth Avenue Townhouse also contains a notable collection of books, artifacts, and other materials, including a first printing of the Bible in the Irish language.

47.     At all relevant times, Dr. Cahill, the Historical Society's president-general emeritus, controlled and dominated the organization. As president-general emeritus, Dr. Cahill selected board members who supported his continued domination and control of the Historical Society. Dr. Cahill also arranged for the appointment and retainer of his son, Christopher Cahill, as the organization's executive director, and for the appointment and retention of another family member, Brendan Cahill, as the organization's secretary.

48.     Dr. Cahill's domination and control of the Historical Society was to the organization's significant detriment. His son Christopher Cahill was unable or unwilling to perform his duties as executive director, conducting himself in a way that interfered with the Historical Society's operations and its development and fundraising efforts. Despite Christopher Cahill's conduct, Dr. Cahill successfully opposed efforts to remove Christopher Cahill from his

Case 1:24-cv-06045-ER    Document 1-1    Filed 08/08/24    Page 14 of 27

position. Dr. Cahill even arranged at times for the removal of directors who sought to hold Christopher Cahill accountable for his conduct or who sought to replace him with a new executive director capable and willing to perform the duties of the position.

## II.    To Pay for Renovations and Repairs on the Fifth Avenue Townhouse, the Historical Society Obtained—and Then Technically Defaulted on—a $3.1 Million Loan

49.    In January 2011, to pay for renovations and repairs on the Fifth Avenue Townhouse, the Historical Society entered into an agreement with Capital One bank in which the organization obtained a $3.1 million loan. The bank, in turn, obtained a mortgage on the building, with the proviso that, as long as the Historical Society kept current on its payments and met or exceeded a minimum coverage ratio, the bank would not record the mortgage.

50.    Although the Historical Society consistently made its payments under the loan from Capital One, it failed to meet or exceed the minimum coverage ratio, leading to a technical default.

51.    In or around August 2016, as a result of the technical default, Capital One informed the Historical Society that the bank would potentially have to accelerate the payment of the debt and also record the mortgage.

52.    At the same time as the loan from Capital One was technically in default, the Historical Society was floundering under the leadership of Christopher Cahill, including dealing with a "steady decline in income" from its annual fundraising dinners. The Historical Society recognized that, if Capital One did in fact accelerate payment of the debt, the organization would be unable to both satisfy its debt and pay for its other expenses.

53.    Given these financial issues, the Historical Society began to consider options for refinancing the loan, including, as reflected in the minutes of the board of directors, approaching one or more persons about the possibility of assuming the loan from Capital One "under renegotiated terms."

Case 1:24-cv-06045-ER    Document 1-1    Filed 08/08/24    Page 15 of 27

### III.    James Doyle, a Georgia-Based Businessman, Made a $3 Million Loan to the Historical Society

54.    In or around January 2017, at the request of Dr. Cahill, James Doyle, a Georgia-based businessman, joined the Historical Society's Executive Council, which functioned as the organization's board of directors, and which, under the Historical Society's bylaws, had the power to "manage[]. . . all the affairs, real and personal property, and business of the Society."

55.    At the first board meeting that Doyle attended, the organization's treasurer presented a report acknowledging, among other things, the organization's urgent need to retire the loan from Capital One. The treasurer explained his preference that "one investor" make a $3 million loan to the organization, after which the organization would "move to a robust fundraising effort to get the Society back on a sound financial basis."

56.    During a March 14, 2017 meeting of the Historical Society's Executive Committee, a committee within the Executive Council that was authorized to exercise the powers of the Executive Council "[i]n the intervals between meetings of the Executive Council," the Executive Committee adopted a resolution accepting a commitment from a "private lender" to loan the Historical Society $3 million at an initial interest rate of five percent.

57.    An investment memorandum attached to the Executive Committee's resolution, which outlined the terms of the "private loan," explained that, in connection with the loan, the Society would execute a "signed mortgage deed" on the Fifth Avenue Townhouse, "to be filed only if the Society fails to meet any payment of interest on a due date." The memorandum noted that the building had "been extensively renovated and modernized," with a recent broker-estimated value of "$84.5 to $95 million."

58.    According to the investment memorandum, the Historical Society intended to pay the loan, at least in part, through a major fund-raising campaign to be commenced in the second

quarter of 2017.

59.     The investment memorandum recognized the importance of the Fifth Avenue Townhouse to the public, describing it as "the only building of its kind open to the public in that area," and "a small but important part of what makes New York City a world class city that is still accessible to the public at large."  If the Historical Society were to sell the building, the memorandum added, "it would be a loss to that neighborhood and to the community at large."

60.     In fact, the "private lender" referenced in the Executive Committee's resolution to accept the $3 million loan was Doyle, who—by virtue of his role as a member of the board of the directors—was a related party within the context of the transaction. Doyle had requested, and upon information and belief Dr. Cahill had approved, that the loan from Doyle be presented as a loan from an anonymous benefactor, rather than a member of the board of the directors.

61.     On March 17, 2017, the Historical Society executed a term loan note with Doyle for $3 million. The loan featured an interest rate the higher of five percent or the prime rate less two-and-a-half percent. The loan also featured a balloon payment of principal due on March 16, 2020. In connection with the loan, the Historical Society entered into a mortgage and security agreement with Doyle for a mortgage on its primary asset: the Fifth Avenue Townhouse.

62.     On March 17, 2017, the Historical Society also entered into a donation agreement with Doyle in which, "[o]n a good faith but legally non-binding basis," Doyle agreed to make an annual contribution to the Historical Society in the amount that the organization's interest payments exceeded his cost of funds.

63.     Prior to the Executive Committee's adoption of the March 14, 2017 resolution accepting the $3 million loan, and the formalization of that agreement on March 17, 2017, Doyle, upon information and belief with the approval of Dr. Cahill, failed to disclose to the board of

directors, or any authorized committee thereof, any facts concerning his interest in the transaction, including the fact that he was the private lender at issue.

64.     Prior to the Executive Committee's adoption of the March 14, 2017 resolution accepting the $3 million loan, and the formalization of that agreement on March 17, 2017, neither the board of directors, nor an authorized committee thereof, analyzed the transaction as a related party transaction and determined that, although Doyle was a director of the Historical Society, the transaction was still fair, reasonable, and in the Historical Society's best interests.

65.     Contemporaneous with the March 14, 2017 resolution accepting the $3 million loan, and the formalization of that agreement on March 17, 2017, neither the board of directors, nor an authorized committee thereof, adequately documented in writing the basis for its approval, including its consideration of any alternative transactions.

## IV.     Following a Letter from the Attorney General, the Historical Society's Board Tried Unsuccessfully to Ratify the Loan from Doyle

66.     Following the related party transaction with Doyle, the Historical Society failed to properly disclose the transaction as required on its IRS Form 990 for the fiscal year 2017. That form required tax-exempt organizations to report on the IRS Form 990, Part X, Line 22, whether they have "loans and other payables to current . . . officers, directors, trustees . . . and disqualified persons," and, if so, to file an accompanying "Schedule L" describing, as relevant here, any "[l]oans to and/or [f]rom [i]nterested [p]ersons" and "[b]usiness [t]ransactions [i]nvolving [i]nterested [p]ersons."

67.     The Historical Society's IRS Form 990 for the fiscal year 2017, which it filed with the Internal Revenue Service in 2018, failed to disclose that it had a loan payable to Doyle, one of its board members, or to provide any more information about this transaction. Instead, it reported only "[s]ecured mortgages and notes payable to unrelated third persons" of $3 million.

17

Case 1:24-cv-06045-ER     Document 1-1     Filed 08/08/24     Page 18 of 27

68.     The Historical Society represented in its IRS Form 990 for the fiscal year 2017 that, prior to filing its annual information return with the federal government, a complete copy of the document was provided to "all members of [its] governing body." At that time, Doyle was a member of the board of directors, the organization's governing body. As a result, Doyle was, or should have been aware, that the Historical Society's IRS Form 990 failed to properly disclose the transaction between himself and the organization.

69.     The Historical Society also failed to properly and timely disclose the transaction to the Attorney General as required. The Historical Society's deadline to file its annual required disclosures with the Attorney General for the fiscal year 2017 was November 15, 2018. Those disclosures were to consist of a CHAR500 form, an accompanying IRS Form 990 with schedules, and an audited financial statement. *See* Exec. Law § 172-b; N.Y. Comp. Codes R. & Regs. tit. 13, § 91.5. But the organization failed by that date to file its required disclosures.

70.     On October 16, 2019, the Attorney General notified the Historical Society, in a letter, that the organization was significantly "delinquent in filing its annual financial report(s) with the New York Attorney General's Charities Bureau." The Attorney General stated that, to resolve the delinquency, the Historical Society would need to file, by November 15, 2019, all its required disclosures for the fiscal year 2017, including its "IRS990" with "all schedules."

71.     In response, the Historical Society finally filed with the Attorney General on November 12, 2019 its required filings for the fiscal year 2017: its CHAR500, accompanying IRS Form 990 with schedules, and audited financial statement. Although the Historical Society certified that the CHAR500 and its attachments were "true, correct and complete," the organization once again failed to properly disclose its related party transaction with Doyle.

72.     On November 26, 2019—after having failed to accurately and timely disclose the

related party transaction with Doyle to both federal and state authorities—the Historical Society organized a "special meeting," where its board of directors attempted to ratify the transaction.

73.     At the meeting, the Historical Society's president conceded that, because the prospective lender had been presented to the board as an anonymous benefactor, rather than a member of the board directors, "the nature of the Loan as a related party transaction was not revealed to the Board." This failure to reveal Doyle's interest in the transaction, the president stated, "may be in violation of New York Not-for-Profit Corporation Law."

74.     As reflected in the minutes of the meeting, neither the president, nor any other person in attendance, offered an assessment of why the transaction was in fact fair, reasonable, and in the Historical Society's best interest, other than that three banks had declined to make a similar offer, and that the loan featured a "market interest rate" and unspecified "generally favorable terms."

75.     The president then instructed the board of directors to "vote yay or nay to ratify the Loan and the entering into of the related party transaction between the Society and Mr. Doyle in accordance with NPCL section 715([j])."

76.     Following the president's instructions, the board of directors voted unanimously to ratify the loan as a related party transaction.

77.     Doyle did not participate in this ratification process.

78.     The Historical Society ultimately disclosed the related party transaction for the first time after the attempted ratification process, in an IRS Form 990 which the organization filed for the fiscal year 2018. That IRS Form 990 did not, however, disclose that the loan from Doyle had been made in 2017. Nor did it accurately identify the transaction elsewhere on Part X, Line 22 of the IRS Form 990, where disclosure of liabilities in the form of "[l]oans and other payables to

19

current and former . . . directors" was required.

**V.    The Historical Society Failed to Meet Its Obligations Under the Loan from Doyle and Thus Decided to Sell the Townhouse**

79.     Between May 2017 and March 2020, under the terms of the loan, the Historical Society paid to Doyle approximately $12,500 per month.

80.     During this period, and despite having agreed in "good faith" to make annual contributions to the Historical Society in the amount that the organization's interest payments exceeded his cost of funds, Doyle declined to make these contributions. Instead, at the behest of Dr. Cahill, Doyle contributed approximately $400,000 in interest payments received from the Historical Society to a different organization, named the Center for International Health and Cooperation, where Dr. Cahill was president and where his son Brendan Cahill received a salary.

81.     On March 16, 2020, the loan between the Historical Society and Doyle matured, requiring the Historical Society to make a balloon payment of the complete amount of principal that remained. The Historical Society, however, failed to make this payment, resulting in a default.

82.     On October 16, 2020, in an effort to address the Historical Society's continuing financial issues, including its debt owed to Doyle, the board of directors, upon information and belief at the direction and control of Dr. Cahill, voted unanimously to sell the Fifth Avenue Townhouse.

83.     In his capacity as a member of the board of directors, Doyle participated in deliberations about the sale of the Fifth Avenue Townhouse. Indeed, Doyle served on the Historical Society's Building Sale Committee, which was directly involved in the efforts to sell the Fifth Avenue Townhouse. Doyle attended the committee's meetings on May 12, 2020; October 26, 2020; December 8, 2020; and March 4, 2021.

84.     Doyle also voted in favor of the sale of the Fifth Avenue Townhouse, casting a yay

vote in favor of the sale at the October 16, 2020 board of directors meeting concerning the sale of the building.

## VI.    The Attorney General Worked with the Historical Society to Revitalize the Organization and Save the Townhouse

85.     Under New York law, when a charitable organization seeks to sell, lease, exchange, or otherwise dispose of "all, or substantially all" of its assets, the organization must obtain the "approval of the attorney general or the supreme court." N.Y. Not-For-Profit Corp. Law § 510(a)(3); *see also* N.Y. Not-For-Profit Corp. Law § 511 (describing the process by which a charitable organization obtains court approval to dispose of its assets). The purpose of this requirement is "to protect the beneficiaries of a charitable organization from 'loss through unwise bargains and from perversion of the use of the property.'" *Rose Ocko Found., Inc. v. Lebovits*, 259 A.D.2d 685, 688 (2d Dep't 1999) (quoting *Church of God of Prospect Plaza v. Fourth Church of Christ, Scientist, of Brooklyn*, 76 A.D.2d 712, 716 (2d Dep't 1980)).

86.     After the Historical Society announced its intent to sell the Fifth Avenue Townhouse, the Attorney General received a petition, which featured more than 40,000 signatures, in opposition to the sale. Describing the building as "a beacon to newly arrived Irish immigrants as well as native born Americans of Irish descent," the petition asserted that it was now "in danger of being sold by a small group, despite all it represents to the Irish in America, in Ireland, and beyond." The petition also stated that it was "vital that the voice of the Irish American Community be respected and this monument to our people be preserved, its collections be protected and good governance ensured."

87.     In the wake of the petition, the Attorney General conducted an investigation into the Historical Society's affairs. The investigation revealed that major governance issues within the Historical Society, due in large part to the domination and control of Dr. Cahill, had brought the

organization to the brink of crisis. Among other things, the Attorney General found that the Historical Society had, without authorization from its board of directors, engaged in a $3 million related party transaction with its director James Doyle.

88.     The Attorney General also found that, under the terms of the loan, the Historical Society had paid to Doyle approximately $450,000 in interest. Although that amount exceeded Doyle's costs of funds to make the loan, implicating Doyle's "good faith" pledge to make an annual contribution in the amount that the Historical Society's interest payments exceeded his cost of funds, Doyle had declined to do so. Instead, at the behest of Dr. Cahill, the Historical Society's former president-general—and the source of many of its governance issues—Doyle had elected to contribute $400,000 in interest payments to a different organization. Notably, that organization was an organization where Dr. Cahill was serving as president and where his son Brendan Cahill received a salary.

89.     In resolving its investigation, the Attorney General required, and the Historical Society agreed to, a plan to revitalize the organization and preserve the Fifth Avenue Townhouse. As part of this plan, which was publicly announced in December 2022, the Historical Society was required to make substantial changes in its governance, including appointing a new interim executive director and interim board of directors to guide the organization to a new governance structure.

90.     In November 2022, in connection with these governance changes, Doyle resigned from the board of the directors.

**I.      Following the Attorney General's Intervention, James Doyle Seeks to Foreclose on the Fifth Avenue Townhouse**

91.     On June 21, 2021, while the Attorney General was actively working with the Historical Society to help it keep the Fifth Avenue Townhouse, Doyle caused a mortgage to be

recorded on the building.

92.     Then, on August 2, 2023, Doyle filed a verified complaint in Supreme Court, New York County, seeking to foreclose on the Fifth Avenue Townhouse. In the complaint, Doyle alleged that, in connection with his loan, the Historical Society owed him $3 million in principal, interest, and other fees and costs. Among the remedies requested in the complaint, Doyle asked the Court to direct a referee to sell the building at a foreclosure action and deliver the title to the successful bidder.

## CAUSE OF ACTION

### Wrongful Related-Party Transactions
### Not-for-Profit Corporation Law §§ 112(a)(10) and 715(f)

93.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 92 above as though fully set forth herein.

94.     Because James Doyle was a "director, officer or key person" of the Historical Society, he was a related party to the organization. *See* N.Y. Not-for-Profit Corp. Law §§ 102(a)(6), (a)(23), (a)(25); N.Y. Not-for-Profit Corp. Law § 715.

95.     Because Doyle was a related party to the Historical Society, any transaction between him and the organization was a "related party transaction." *Id.* § 715(a)-(b).

96.     Because Doyle offered the Historical Society an interest-bearing loan in the amount of $3 million, to be secured through a mortgage on a property with a broker-estimated value of nearly $100 million, Doyle had both an "interest" and a "substantial financial interest" in the transaction. *See id.*

97.     Despite having an interest in the related party transaction, Doyle failed to "disclose in good faith to" the Historical Society's board of directors, "or an authorized committee thereof,

Case 1:24-cv-06045-ER     Document 1-1     Filed 08/08/24     Page 24 of 27

the material facts concerning such interest," in violation of Not-for-Profit Corporation Law § 715(a).

98.     As a result of, among other things, Doyle's failure to disclose his substantial financial interest in the related party transaction, he caused the Historical Society to enter into the transaction without its board of directors, "or an authorized committee thereof":

a.     "determin[ing]" that the transaction was "fair, reasonable and in the corporation's best interest at the time of such determination," in violation of Not-for-Profit Corporation Law § 715(a).

b.     "[p]rior to entering into the transaction, consider[ing] alternative transactions to the extent available," in violation of Not-for-Profit Corporation Law § 715(b)(1).

c.     "[a]pprov[ing] the transaction by not less than a majority vote of the directors or committee members present at the meeting," in violation of Not-for-Profit Corporation Law § 715(b)(2).

d.     "[c]ontemporaneously document[ing] in writing the basis for the board or authorized committee's approval, including its consideration of any alternative transactions," in violation of Not-for-Profit Corporation Law § 715(b)(3).

99.     Because, among other things, the Historical Society's attempted ratification of the related party transaction did not take place "prior to receipt of any request for information by the attorney general regarding the transaction," the defenses under Not-for-Profit Corporation Law § 715(j) for a violation of § 715(a) or (b) are unavailable.

100.     Because Doyle, in his capacity as a member of the Historical Society's board of directors, deliberated about and voted in favor of the sale of the Fifth Avenue

Townhouse, with the understanding that the Society intended to use proceeds from the sale of the building to satisfy the loan at the center of the related party transaction, Doyle "participate in deliberations or voting relating to a related party transaction in which he . . . ha[d] an interest," in violation of Not-for-Profit Corporation Law § 715(h).

101.    Because of these violations of Not-for-Profit Corporation Law § 715(a), (b), and (h), the related party transaction between the Historical Society and Doyle should be voided or rescinded. *Id.* § 715(f).

## PRAYER FOR RELIEF

Wherefore, the Attorney General, on behalf of Plaintiff-in-Intervention the People of the State of New York, requests judgment against the Defendant-in-Intervention James Doyle for the following relief:

A.    Void or rescind the related party transaction between the American Irish Historical Society and James Doyle pursuant to Not-for-Profit Corporation Law §§ 112(a)(10) and 715(f);

B.    Dismiss with prejudice Defendant-in-Intervention James Doyle's foreclosure action, *see Doyle v. American Irish Historical Society*, No. 850468/2023 (Sup. Ct.); and

C.    Award any additional relief that the Court deems just and proper.

Dated:        New York, New York
              October 26, 2023

                                      LETITIA JAMES
                                      Attorney General of the
                                      State of New York

                          By:

                                      JAMES SHEEHAN
                                      Charities Bureau Chief
                                      James.Sheehan@ag.ny.gov
                                      28 Liberty Street

25

New York, New York 10005
Tel. (212) 416-8401

EMILY STERN
Charities Bureau, Enforcement Section
Chief
Emily.Stern@ag.ny.gov

DANIEL SUGARMAN
Assistant Attorney General
Daniel.Sugarman@ag.ny.gov

28 Liberty Street
New York, New York 10005

MEGHAN FAUX, *Chief Deputy Attorney General for Social Justice*
*Of Counsel*

Case 1:24-cv-06045-ER    Document 1-1    Filed 08/08/24    Page 27 of 27

## VERIFICATION

Pursuant to CPLR 3020(d)(2), JAMES SHEEHAN, being duly sworn, deposes and says:

I am an Assistant Attorney General in the office of Letitia James, Attorney General of the State of New York (the "Attorney General"). I am duly authorized to make this verification.

I have read the foregoing complaint and am acquainted with the facts alleged therein based on the Attorney General's investigation of the transactions upon which the complaint is based, the annual filings and other reports made by the American Irish Historical Association, Inc. with the Charities Bureau of the Attorney General's office, and the investigative materials contained in the files of the Attorney General's office. To my knowledge based on such acquaintance with the facts, the complaint is true, except as to those allegations made upon information and belief, and as to those allegations, I believe that they are true.

The reason this verification is not made by plaintiff is that plaintiff is a body politic and the Attorney General is its duly authorized representative.

James Sheehan
Charities Bureau Chief

27